## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIN M. GARDNER and JEFFREY M. GARDNER | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | 1:10-CV-0527 |
| | : | (JUDGE MARIANI) |
| SALLY A. BARRY, RICHARD WORLEY, JOHN LEAHY, and LEBANON COUNTY | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM AND ORDER

Plaintiffs Erin M. Gardner ("Erin") and Jeffrey M. Gardner ("Jeffrey") (together, "Gardners" or "Plaintiffs") filed this federal civil rights lawsuit alleging that Defendants violated their constitutional right to associate under the First and Fourteenth Amendments. Upon the close of discovery, remaining Defendants Sally A. Barry ("Barry"), Richard Worley ("Worley"), and John Leahy ("Leahy") filed a Motion for Summary Judgment. For the reasons set forth below, Defendants' Motion for Summary Judgment will be granted.

## BACKGROUND

This action arises upon the Complaint of Plaintiffs for alleged violations of their associational rights as guaranteed by the First and Fourteenth Amendments to the Constitution. Plaintiffs raise their

constitutional claims pursuant to 42 U.S.C. § 1983, and establish proper subject matter jurisdiction under 28 U.S.C. § 1331.  The state law claims are properly brought before the Court pursuant to 28 U.S.C. § 1357(c).

Plaintiffs are now husband and wife, but at all times relevant to the events giving rise to this matter, they were unmarried.  This case concerns the circumstances surrounding the genesis of their relationship and the propriety of certain actions undertaken by Defendants to prevent Plaintiffs from associating with one another.

Erin began working for the Lebanon County Adult Probation Department ("Probation Department") in February 2005.  (See Erin Gardner Dep. 19:4-10, Feb. 2, 2011.)  Erin admits signing an employee code of conduct forbidding fraternization with probationers, although she could not remember reading it.  (See Erin Dep. 20:1-22.)  Erin understood that her supervisors did not approve of such fraternization, but says that she was not aware that it was an official policy.  (See Erin Dep. 22:4-6.)  Erin further testified that she thought it would be inappropriate for a probation officer to have "intimate relations" with a probationer over whom she had supervisory authority.  (See Erin Dep. 25:1-11.)

In 2005, Jeffrey was charged with several criminal acts including burglary, receipt of stolen property, criminal mischief, and criminal

conspiracy. (See Jeffrey Gardner Dep. 15:1-6, Feb. 2, 2011.) He pleaded

guilty, but prior to sentencing Jeffrey received two citations for driving while

intoxicated. (See Jeffrey Dep. 15:7-18.) The charges were combined and

Jeffrey was sentenced to a term of 22 months at an in-patient rehabilitation

program called Crossroads, which is administered by the Veterans' Affairs

Hospital in Lebanon, Pennsylvania. (See Jeffrey Dep. 15:25, 16:1-5.) He

was also sentenced to an additional twelve months of probation. (See

Jeffrey Dep. 16:-1.) For the duration of Jeffrey's sentence, he was

supervised by the Probation Department for a total of 34 months. (See

Jeffrey Dep. 16:7.) Jeffrey was released from the VA Hospital in August of

2007, after only 15 months. (See Jeffrey Dep. 17:19-21.) Jeffrey's

probation required him to sleep at home unless he received permission

from his probation officer to do otherwise. (See Jeffrey Dep. 19:10-20.)

Jeffrey was supervised by Erin from the time of his release from the VA

Hospital in August 2007. (See Jeffrey Dep. 20:4-8.) During the first six

months following Jeffrey's release from in-patient care, he was placed on

electronic monitoring. (See Jeffrey Dep. 21:22-23.) Jeffrey understood

that a violation of his probation, including a failure to report his

whereabouts if he was not spending the night in his home, would subject

him to a mandatory term in prison. (See Jeffrey Dep. 23:13-25.) Jeffrey

further understood the role of the Probation Department as an institution tasked with keeping probationers "on the straight and narrow for . . . as long as they could, so hopefully that they would continue doing what they were supposed to be doing." (See Jeffrey Dep. 24:10-17.)

According to Jeffrey, his relationship with Erin turned physical in December 2007. (See Jeffrey Dep. 25:1-6.) Jeffrey admits that he spent at least several nights at Erin's home without asking for permission from the Probation Department. (See Jeffrey Dep. 25:7-25, 26:1-9.) Jeffrey further admits that he and Erin made false representations to another probation officer, Meghan Fertenbaugh ("Fertenbaugh"), in order to conceal a trip they had planned to Atlantic City, New Jersey. (See Jeffrey Dep. 38:2-14; Erin Dep. 72:12-24.) Although Erin recorded the Atlantic City trip in Jeffrey's log book as a "family" visit, Jeffrey testified that he had no intention of seeing family on that trip. (See Jeffrey Dep. 39:2-12.) Erin testified that she believed that Fertenbaugh would have objected to his Atlantic City trip if she knew Jeffrey would be accompanied by Erin. (See Erin Dep. 85:4-11.) Erin also knew that if she did not keep her relationship with Jeffrey a secret that she would be fired. (See Erin Dep. 60:2-16, 63:12-20.)

On March 6, 2008, Jeffrey requested leave from the Probation Department to visit Erin in Maryland, where she had taken a job with the federal government at Fort Meade. (See Jeffrey Dep. 39:25-40:5.) Although Jeffrey placed a call to Fertenbaugh, he was unable to speak with her, and instead left a message in which he requested a travel pass to see Erin. (See Jeffrey Dep. 40:8-12.) Fertenbaugh did not return his call. (See Jeffrey Dep. 40:24.) Jeffrey did, however, receive a call the following Thursday night from Defendant, Sally Barry ("Barry"), the Chief of Adult Probation. (See Jeffrey Dep. 40:24-25.) Barry inquired as to why Jeffrey wanted to visit Erin in Maryland, and further asked about their relationship. (See Jeffrey Dep. 41:8-22.) Barry asked Jeffrey if he ever kissed Erin, and when Jeffrey showed reluctance to answer, Barry informed him that they had a problem and that Jeffrey should come to the Probation Department on Monday for a meeting. (See Jeffrey Dep. 42:1-12.) Barry also denied Jeffrey his travel pass. (See Jeffrey Dep. 42:13-17.) When Jeffrey informed Erin of his conversation with Barry, she told him not to worry and that she would come to Pennsylvania to visit him. (See Jeffrey Dep. 42:18-25, 43:1-13.) Erin arrived at Jeffrey's home the next day between 6:00 p.m. and 6:15 p.m., and shortly afterwards, Barry and Richard Worley ("Worley") knocked on Jeffrey's front door. (See Jeffrey Dep. 43:10-25,

44:1-2.) Plaintiffs maintain that Barry and Worley did not ask to enter the residence, but pushed their way inside. (See Jeffrey Dep. 43:15-18.) When Barry and Worley saw Erin, Barry turned to Jeffrey and ordered him to tell Erin to leave or else he would be in violation of his probation. (See Jeffrey Dep. 44:24-25.) Plaintiffs allege that Barry told them that Jeffrey needed to tell Erin to leave, as they were unable to do so themselves. (See Jeffrey Dep. 45:1.) They informed Plaintiffs that Erin was the subject of an internal investigation and that she needed to leave immediately. (See Jeffrey Dep. 45:3-11.) The fact that Erin was the target of an internal investigation was repeated several times. (See Jeffrey Dep. 46:4-7.) Erin left the premises after objecting strenuously about Barry and Worley's authority to give such an order to Jeffrey. (See Jeffrey Dep. 45:11-25.)

The following Monday, Jeffrey went to the Probation Department to meet Barry and Defendant Detective John Leahy ("Leahy"). (See Jeffrey Dep. 48:18-23.) Jeffrey testified that Leahy asked him very personal questions about his relationship with Erin, including whether and when the couple had sexual relations. (See Jeffrey Dep. 49:18-19.) Jeffrey was interviewed on a subsequent occasion, and was required to memorialize the circumstances of his relationship with Erin in writing. (See Jeffrey Dep. 53:1-17.) Jeffrey was told to have no contact with Erin. Plaintiffs did not

see each other between March 12, 2008, and the end of May 2008.  (See Jeffrey Dep. 60:2, 61:1-2.)  However, after speaking with a lawyer, Plaintiffs married on June 17, 2008.  (See Pls.' Ans. To Statement of Facts, ¶ 10, ECF Dkt. 42.)

Erin was charged, and found guilty in the Court of Common Pleas of Lebanon County, of falsifying public records in connection with Plaintiffs' trip to Atlantic City.  (See Erin Dep. 128:7-10.)  Erin was acquitted of another charge for obstruction of justice.  (See Erin Dep. 128:11-15.)  Erin was also forced to resign from her position with the federal government and relinquish her security clearance.  At all times relevant to these events, Jeffrey was under the direct supervision of the Probation Department.

## STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A district court may grant a defendant's motion for summary judgment when the plaintiff fails to provide any genuine issue of material fact. See Rule 56(c); see also Krouse v. Amer. Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The

moving party has the burden to establish before the district court that the non-moving party has failed to substantiate its claims with evidence. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); see also Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). "The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial." See  Book v. Merski, 2009 WL 890469, at *4 (W.D. Pa. Mar. 31, 2009)(citing Matsushita Elec. Indus. Company v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-61 (3d Cir. 1989)("the non-movant must present affirmative evidence—more than a scintilla but less than a preponderance—which supports each element of his claim to defeat a properly presented motion for summary judgment.")).  The non-moving party is then charged with providing evidence beyond the pleadings to show specific facts by affidavit or by information contained "in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim." Book, 2009 WL 890469, at *4 (citing Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061).

Material facts are those whose resolution will affect the outcome of the case under applicable law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the Court is required to resolve any doubts as to the existence of material facts in favor of the non-moving party for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegations or suspicions." Firemen's Ins. Company of Newark, N.J. v. Du Fresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment, therefore, is only precluded if a dispute about a material fact is "genuine", viz., if the evidence would permit a reasonable jury to return a verdict in favor of the non-moving party. See Anderson, 477 U.S. at 247-249.

## DISCUSSION

Associational interests arising under the First and Fourteenth Amendments are carefully guarded by the Courts; however, the right to free association is not without limits. In Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court found that "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Id. at 622. "The

right to associate for expressive purposes is not, however, absolute." Id. at

623. "Infringements on that right may be justified by regulations adopted to

serve compelling state interests, unrelated to the suppression of ideas, that

cannot be achieved through means significantly less restrictive of

associational freedoms." Id. In the context of convicted criminals, the Third

Circuit is clear that "those convicted of crimes lose a measure of their

liberties." United States v. Rodriguez, 178 Fed. Appx. 152, 158 (3d Cir.

2006). Accordingly, probationers do not enjoy the same constitutional

freedoms as those granted to the general population.

The Courts of Appeals have recognized several areas in which

"compelling state interests" serve as a sound basis to enact restrictions on

associational rights. In Lape v. Commonwealth of Pennsylvania, 157 Fed.

Appx. 491 (3d Cir. 2005), the Third Circuit upheld the termination of a

female employee of the Pennsylvania Department of Corrections after she

married a former inmate. The Court held that the prison's anti-

fraternization rule in its Code of Ethics bore a reasonable connection to

legitimate state interests in protecting the sanctity and security of the prison

system. See id. at 6. Furthermore, in Lape, the Court found the former

prison guard's termination to be constitutional even though the prisoner

with whom she was involved had been released from state custody prior to

the commencement of their intimate relationship.[1]  In the present matter, Jeffrey was still under the direct supervision of the Probation Department, and his physical relationship with Erin admittedly began prior to Erin's voluntary separation from the Probation Department.  In addition, the rule articulated in <u>Lape</u> illustrates that only one of the constrained parties need be subject to some valid associational restriction in order for it to pass constitutional muster.  In <u>Lape</u>, the prison guard was prohibited from fraternizing with a former inmate even though she was no longer in a position to provide special treatment or create a security issue at the prison.  No future security issue could foreseeably arise from their relationship, but the Court still found their associational rights subject to restriction.   The facts presented in the present matter are similar to the degree that Erin was no longer in a position to provide special treatment to Jeffrey since she had resigned her position as a Probation Officer.  Nevertheless, following <u>Lape</u>, <u>supra</u>, the prohibition is proper.  The Defendants, like the prison officials in <u>Lape</u>, have a compelling interest in protecting the reputation and integrity of the Probation Department.

---

[1] The Plaintiff in <u>Lape</u> had been charged with violating the Code of Ethics applicable to her as a Corrections Officer "as a result of a relationship between herself and a resident at the Penn Pavilion Contract Community Corrections Center." <u>Id.</u> at 495. The Court noted that the Plaintiff responded to these charges and "confirmed that she had received letters from Lape while he was at Penn Pavilion and that she had sent him a Christmas card," and that "as a result of the letters she received from him while he was at Penn Pavilion, . . . 'seeds were planted' that led to her having 'romantic feelings toward him and this led to her accepting his telephone calls and the invitation to dinner once he was paroled'." <u>Id.</u> The Plaintiff met with the inmate, Lape, after he was paroled and while vacationing together, Plaintiff and Lape were married. <u>Id.</u> at 493. During this time period, Plaintiff continued to be employed as a Corrections Officer.

Prohibiting Plaintiffs from associating with one another during the pendency of an investigation into Erin's conduct was rationally calculated and narrowly tailored to accommodate such interests.

Similarly, in <u>Akers v. McGinnis</u>, 352 F.3d 1030 (6th Cir. 2004), the Sixth Circuit upheld a rule instituted by the Michigan Department of Corrections which banned all employees from fraternizing with prisoners, parolees, probationers, their relatives, or their visitors. Specifically, the Court held that the anti-fraternization rule "easily meets the rational basis test for the non-public association restrained by the Rule." <u>Id.</u> at 1039. The Court continued that "[t]he MDOC has a legitimate interest in preventing fraternization between its employees and offenders and their families." <u>Id.</u> The Court recognized the willingness of offenders to break the law, and noted that the MDOC employees may be vulnerable and assist former inmates with regard to the commission of other offenses. The rule is a rational means for advancing a legitimate state interest. <u>Id.</u>

The <u>Akers</u> Court, <u>supra</u>, also noted that a "direct and substantial interference," with intimate association was subject to strict scrutiny, while lesser interferences merely merited rational basis review. <u>Id.</u> at 1040. The Court held that as a "general rule" it will find "direct and substantial burdens only where a large portion of those affected by the rule are absolutely or

largely prevented from marrying, or where those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses." Id. In the present matter, Plaintiffs were free to date and marry almost any other person, and the restriction limiting their interaction did not pose such a significant burden so as to constitute an absolute or "large" ban on their potential spousal pool. As the Sixth Circuit noted in similar circumstances, "[t]his is far from the absolute bar against marrying a majority of the jurisdiction's population said in Loving to be a direct and substantial interference." Akers, 352 F.3d 1040-41.

In Flaskamp v. Dearborn Public Schools, 385 F.3d 935 (6th Cir. 2004), the Sixth Circuit held that: (1) rational basis review applied to a substantive due process claim involving the prohibition of high school teachers from dating former students; (2) the decision to discharge a teacher did not violate the teacher's substantive due process right to intimate association; (3) a principal's questioning of a teacher about her relationship with a former student did not violate the teacher's right to privacy. Not only did the Sixth Circuit find that a rule prohibiting high school teachers from having physical relationships with their former students was constitutionally sound, but it upheld the district court's ruling that qualified

immunity was proper for those who enforced the regulation because "the contours of the [teacher's privacy] were not sufficiently clear to have put Defendants on notice that they violated Plaintiff's constitutional rights." Id. at 940. Thus, not only was the policy sound, but those enforcing the policy were entitled to qualified immunity even if the particular teacher's rights were violated.

At present, Plaintiffs argue that Defendants have violated their fundamental right to intimate association. Plaintiffs married on June 17, 2008, and have one biological child. Nevertheless, the broad protections constitutionally granted under the First and Fourteenth Amendment to the right of free association do not extend to circumstances where, as here, one of the Plaintiffs, at all times relevant, was on probation and subject to limitations that would otherwise not be applicable to a United States citizen, and where the restriction imposed on him resulted from a determination that his conduct, together with the conduct of the other Plaintiff in her capacity as his probation officer, were in violation of their respective obligations as probation officer and probationer. Accordingly, Defendants acted with reasonable and legitimate justification in requiring Jeffrey to ask Erin to leave his house and in ordering Jeffrey to refrain from engaging in

any contact with Erin "until there was a disposition or that internal investigation was resolved." (Barry Dep. 47:21-23)

In their Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 43), Plaintiffs argue that the "no-contact order was cruel, vindictive, and unnecessary in addition to being an unconstitutional violation of their rights. . . ." (See Pls.' Br. in Opp. Defs.' Mot. Summ. J. 12, ECF Dkt. 43.)  Plaintiffs further aver that "they had a right to associate under the First Amendment and also a right under the 14th Amendment to plan and consummate their marriage." (Id.)  Plaintiffs, however, fail to accurately, and completely, identify the legal issue that must be addressed by this Court under the facts presented in Plaintiffs' own papers: namely, whether a probationer can be restricted from associating with a specific person even if an intimate relationship exists between the probationer and that person.  Contrary to Plaintiffs' assertion, the rights to marry and "fall in love" are not at issue in this case.  As Plaintiffs stated in their opposition brief, "[t]he essence of [P]laintiff's [sic] argument is that whether Erin violated the parole department's policy or not there was no lawful justification or lawful purpose for unlawfully ordering the pair to not have contact for months on end." (Id. at 13.)  Framing the question in these terms obfuscates the true issue of whether a probationer is entitled to full

and unrestricted associational rights. The case law overwhelmingly

provides that a probationer's right to free association can be abridged

under circumstances similar to those presented by Plaintiffs in their own

submissions to this Court. Thus, in Lape, supra, the Plaintiff alleged that

the Department of Corrections had "violated her First Amendment

association rights when it fired her because she was married to a parolee."

Id. at 498. The Court of Appeals rejected that argument and affirmed the

finding of the District Court that the action taken against the Plaintiff had not

been taken because of her marriage to a parolee, but rather because she

had had a "private relationship with an inmate", had failed to report her

receipt of correspondence from the inmate and had "intentionally withheld

information regarding her fraternization with an inmate, her marriage and

the change in her husband's status when he was reincarcerated as a

parole violator." Id. Here, the actions complained of by Plaintiffs were

undertaken because the Plaintiffs began a "private relationship" while

Jeffrey was on probation and Erin was his Probation Officer, in violation of

a no-fraternization rule and for the further reason that Erin, in complicity

with Jeffrey, falsified records to conceal their relationship in violation of her

office's no-fraternization rule and the criminal law of the Commonwealth of

Pennsylvania. See discussion of Lape, supra, at page 12. Jeffrey's

continuing status as a probationer at the time of the actions complained of prevents Plaintiff from asserting a valid claim of deprivation of a constitutional right as a result of the Defendants' actions.

Plaintiffs' assertion that Barry and Worley threatened Jeffrey with prison if he did not instruct Erin to leave his home, and that Plaintiffs were "forbidden to see one another in violation of the law" do not alter the Court's analysis. Again, Plaintiffs do not account for Jeffrey's probationer status, which subjects him to constitutionally valid associational restrictions. As the Courts of Pennsylvania have routinely held, "an implied condition of any sentence of probation" is that the defendant will not be involved in the commission of another crime. See Com. v. Mallon, 406 A.2d 569, 571 (Pa. Super. Ct. 1979)(citing Com. v. Martin, 396 A.2d 671 (1978); Com. v. Duff, 192 A.2d 258, rev'd on other grounds, 200 A.2d 773 (Pa. 1963)). The probation department can act to prevent a probationer from participating in criminal activity without a specific court order. In fact, the Third Circuit upheld the imposition of such "special conditions" in United States v. Rodriguez, 178 Fed. Appx. 152, 158 (3d Cir. 2006)("special conditions that restrict constitutional rights are upheld so long as they (1) are directly related to deterring the [probationer] and protecting the public and (2) are narrowly tailored"). At present, although the Defendants required Plaintiffs

to disassociate without a specific court order, the need to include a formal condition of probation prohibiting Jeffrey from fraternizing with Erin, under normal circumstances, was completely unforeseeable. Accordingly, it was not unreasonable, under the then developing circumstances, for Defendants to order Plaintiffs to have no contact pending a resolution of the investigation into Erin's activities. Furthermore, Jeffrey's participation in the Crossroads program, which is designed to rehabilitate substance abuse users in lieu of prison sentences, was well served by Defendants' prohibition.

In Commonwealth v. Koren, 435 Pa. Super. 499, 646 A.2d 1205 (1994), the Superior Court held that associational rights were not threatened when the probation department ordered a woman to have no contact with her fiancée for two years while on probation because the fiancée was the reason for her underlying criminal conduct. Similarly, in Wheeler v. Pennsylvania Bd. of Probation and Parole, 862 A.2d 127 (Pa. Commw. Ct. 2004), the Commonwealth Court found that a restriction imposed upon a parolee that he have no contact with his wife, because of his past record of domestic abuse, was constitutionally sound. In the present matter, Defendants had a compelling interest in preventing Jeffrey, as a probationer, from associating with Erin, as Jeffrey was complicit in the

commission of prior criminal activity for which Erin was later convicted. The

Defendants possessed compelling reasons to require Jeffrey's

disassociation with someone with whom he was a collaborator in prior

criminal activity and to whom he was not at that time married. Jeffrey

participated in Erin's criminal conduct, and as a result, he became her

accomplice. Defendants had a reasonable and good faith belief that their

order prohibiting Jeffrey from associating with Erin served to protect the

purposes and integrity of the state probation system, and was a valid

exercise of their power.

The undisputed facts in this case, taken from the submissions and

exhibits provided to the Court by Plaintiffs, indicate that Plaintiffs suffered

no constitutional deprivation. While Jeffrey was on probation, he was not

entitled to the same constitutional rights to association that he would

otherwise enjoy absent his conviction. The Defendants acted reasonably

and legitimately to protect the integrity of the probation system, and did so

in an effort to further the state's compelling interest in rehabilitating

convicts. The Defendants' purpose in keeping Plaintiffs apart was to

vindicate the principle that probation officers are not to have intimate

relationships with probationers, and that they are not to engage in criminal

conduct to conceal such activity.  Defendants' actions, therefore, are
constitutionally sound.

Plaintiffs' claims in this case cannot be evaluated without recognizing
the dispositive fact that, at all times relevant to Plaintiffs' case, Jeffrey was
a probationer and subject to associational restrictions that would not
otherwise be applicable to him.  The additional fact that certain directives
were given to Jeffrey resulted from Defendants' determination that Erin, in
her capacity as Jeffrey's probation officer, had not only violated her duties
as a probation officer, but also engaged in criminal conduct, which was
subsequently confirmed by Erin's conviction for falsifying public records.
The order for Plaintiffs to remain apart was not predicated upon Erin's role
as Jeffrey's former probation officer; rather, the order was based upon the
fact that Erin was under investigation for certain acts for which she would
later be convicted and in which Jeffrey was complicit.  See, e.g., Lape, 157
Fed. Appx. at 498 (finding that in the absence of evidence showing that
plaintiff was discharged because she was married to a parolee, the court
need not address the claim; rather, it is apparent that plaintiff was fired as a
prison official because she began an intimate relationship with a former
inmate).

Finally, because the Court is resolute in its determination that Defendants did not violate Plaintiffs' constitutional rights and that the law supports the propriety of the Defendants' actions, we find it unnecessary to resolve the issue of qualified immunity.  If we were to hold otherwise, however, we would find Defendants' actions to be undertaken in a good faith attempt to vindicate the important public policy of, and compelling state interest in, preserving the integrity of the probation system, which would warrant the application of the qualified immunity defense.

## **CONCLUSION**

For the reasons set forth in this opinion, Defendants' Motion for Summary Judgment (Doc. 39) will be granted.   An appropriate Order will follow.

DATE: March 1, 2012

Robert D. Mariani
United States District Judge

THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERIN M. GARDNER and JEFFREY    :
M. GARDNER    :
   :
     **Plaintiffs**    :
**v.**    :   **1:10-CV-0527**
   :   **(JUDGE MARIANI)**
SALLY A. BARRY, RICHARD WORLEY,    :
JOHN LEAHY, and LEBANON COUNTY    :
   :
     **Defendants**    :

## ORDER

On September 16, 2011, remaining Defendants Sally A. Barry, Richard Worley, and John Leahy, filed a Motion for Summary Judgment (Doc. 39). For the reasons set forth in the accompanying memorandum, **NOW,** on this **1st** day of **MARCH, 2012, IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. 39) is **GRANTED**.

2. The Court enters judgment in favor of Defendants and against Plaintiffs.

3. The Clerk of the Court is directed to **CLOSE** the case.

Robert D. Mariani
United States District Judge